LOUISE DYSON *vs.* RHODE ISLAND COMPANY.

PROVIDENCE—FEBRUARY 4, 1904.

PRESENT : Stiness, C. J., Tillinghast and Blodgett, JJ.

(1)　*Defaulted Cases.　Assessment of Damages.　Trial by Jury.*

At common law, from the reign of Edw. III (1327), in defaulted cases, it was the practice of the court to award damages or to permit the jury to inquire concerning them, to enlighten the conscience of the court. This was not a matter of right, but of practice ; and the finding of the jury upon the writ of inquiry was not a *verdict,* but might be disregarded by the court.

In Rhode Island, the act of the General Assembly, in 1647, creating the " Generall Court of Tryall's," provided for the use of writs of inquiry in defaulted cases.

Between the years 1671 and 1710 it was the practice of the court to submit the question of damages in defaulted cases to a jury, but by the year 1729 it was the universal practice in such cases for the court to assess damages.

By the act of 1729, creating the Superior Court of Judicature, it was expressly given all the powers vested in the courts of law in England, thereby conferring the same jurisdiction conferred upon the " Generall Court of Tryall's " by the act of 1666. This same act created inferior courts of Common Pleas. In the latter courts it was the practice from the beginning that damages, even in tort cases, should be assessed by the court.

Digest 1767 (p. 59), " an act regulating sundry proceedings in the several courts in this colony," providing " that in all cases, both at the Inferior and Superior Courts, where judgment shall pass by default . . . where damages are to be inquired into, damages shall be inquired into and assessed by the Court or otherwise by a writ of enquiry at the discretion of the Court," conferring this special authority seems to have been a recognition of the common law of the colony.

This act was substantially re-enacted in the revision of 1798 (p. 166) ; in the revision of 1822 (p. 126) ; in the revision of 1844 (p. 129) ; in the revision of 1857, cap. 186, sec. 7 ; in the revision of 1872, cap. 202, sec. 7 ; in the revision of 1882, cap. 213, sec. 8 ; in the judiciary act of 1893, cap. 23, sec. 5 ; and in the revision of 1896, cap. 243, sec. 5, providing that " In all cases except where otherwise provided, if judgment be rendered on default . . . damages shall be assessed by the court with or without the intervention of a jury, in the discretion of the court."

*Held,* that, while the statute does not prohibit the court from calling to its aid a jury in such case, it does provide that the damages when assessed shall be assessed by the act of the court, which may award more or less than the jury awarded.

TRESPASS ON THE CASE for negligence. Heard on petition of defendant for new trial, and petition denied. Case remitted to the Common Pleas Division for assessment of damages.

BLODGETT, J. This is an action on the case for negligence.

In the Common Pleas Division the defendant, by its counsel in open court, submitted to a default and then moved that damages be assessed by the court. The defendant's motion was denied and a jury was empanelled therefor and found damages for the plaintiff in the sum of $2,250. To the refusal of the court to assess the damages without the intervention of a jury the defendant seasonably excepted, and the case is now before us on its petition for a new trial grounded on the alleged error of this ruling, and also upon the ground that the damages awarded by the jury were excessive and unjust.

The statute under which these proceedings were had is Gen. Laws R. I. cap. 243, § 5, as follows :

" In all cases except where otherwise provided, if judgment be rendered on default, discontinuance, submission, or demurrer, damages shall be assessed by the court, with or without the intervention of a jury, in the discretion of the court."

It will be observed that the language of the statute directs that damages " shall be assessed by the court, with or without the intervention of a jury, in the discretion of the court." Upon its face, then, the statute does not require the court to call a jury to its aid for that purpose. Neither is the court prohibited from doing so ; but the court may call in a jury or may refrain from doing so, in its discretion. And this provision is of considerable antiquity in this State, being first adopted in substantially its present form more than one hundred and twenty-five years ago.

In the Digest of 1767 (p. 59) is to be found " An Act regulating Sundry Proceedings in the several Courts in this Colony," in which it is provided as follows : " That in all cases both at the Inferior and Superior Courts where Judgment shall pass by Default, Discontinuance, *Nihil Dicit, Non sum informatus*, or Demurrer where Damages are to be enquired into and assessed, Damages shall be enquired into and assessed by the Court or otherwise by a Writ of Enquiry at the Discretion of the Courts."

In the Revision of 1798 (p. 166), " An Act prescribing the Manner of Proceeding in Courts," it is provided, by section 13 : " That in all cases in the Supreme Judicial Court and Courts of Common Pleas when judgment shall be rendered on default, discontinuance or

demurrer, damages shall be assessed by the Court with or without the intervention of a Jury at the discretion of such court."

In the Revision of 1822 (p. 126), "An Act prescribing the Manner of Proceeding in Courts," section 13 re-enacts the last provision *verbatim* with addition of the word "submission" to the cases above enumerated. This was again re-enacted in the Revision of 1844, p. 129, in section 14 of "An Act prescribing the Manner of Proceedings in Courts;" in the Revisions of 1857, Rev. Stat. cap. 186, § 7; 1872, Gen. Stat. cap. 202, § 7; 1882, Pub. Stat. cap. 213, § 8; 1893, Judiciary Act, cap. 23, § 5; 1896, Gen. Laws, cap. 243, § 5.

From the foregoing citations it will be seen that there was no statutory right to have damages in a defaulted case assessed by a jury at the time of the adoption of the constitution in 1843.

Two questions are presented for our consideration by the exceptions, one being whether damages must be assessed by a jury as matter of right when the question of damages is the only question to be determined; and the other being this: If an assessment of damages by a jury is not a matter of right, what is the effect of the finding of a jury in cases in which the court has entrusted the consideration of that question only to a jury?

Properly to decide these questions involves an examination of the respective provinces of court and jury, and requires us to trace the growth of the method of assessing damages in defaulted cases at the common law; and it therefore becomes necessary to consider the adjudications of the courts upon the law of England as it anciently stood, in deference not only to the injunction of Lord Coke in that behalf (*Pilford's Case*, 10 Coke Rep. 115)—"*Satius est petere fontes quam sectari rivulos*"—but in view also of the statute of the General Assembly of the colony contained in the Digest of 1767 (p. 56), providing "that in all Actions, Causes, Matters and Things whatsoever where there is no particular Law of this Colony, or Act of Parliament introduced for the Decision and Determination of the same, then and in such Cases the Laws of England shall be in Force for the Decision and Determination of the same," as well as of the decision of this court in *Martin* v. *Clarke*, 8 R. I. p. 403, that "the colonists here upon their emigration brought with them to this country the law of England as it then existed as modified by statutes so far as it was applicable to their condition and circumstances here." See also *Bishop* v. *Tripp*, 16 R. I. 198. Act of 1647 (I R. I. Col. Rec. 158). Act of 1700 (Dig. 1719, p. 45).

In the Registrum Brevium, of which it is said by Lord Coke

(Pref. Part X, Coke's Rep. Th. & F. ed. XXIV) that it is "the ancientest book of the law" and that it "containeth the original writs of the common law," and that it is (Pref. Part 8, Coke's Rep. Th. & F. ed. XXIII) "so ancient as the beginning whereof cannot be shewed," adding also, "*concludere licet hunc esse librum tum antiquitatis, tum authoritatis maximæ,*" . . . "And of these ancient writs I will say that all the secretaries in Christendom may learn of them to express much matter in few and significant words," are to be found the form of a writ for the summoning of a jury for the trial of an issue, and the form for a writ of inquiry for the assessment of damages.

The form of a writ of *venire facias* to summon a jury of twelve men to determine an issue between the parties is as follows (Reg. Brev. Editio Quarta (1687)):

"*Rex, Vicecomiti salutem. Praecipimus tibi qd' venire facias coram justitiariis n̄ris apud Westm' à die, &c. 12 tam milites quàm alios liberos & legales homines de visinetu de E. quorum quilibet habeat centum solidatas terrae, tenemen̄, vel reditus per annum ad minus, per quos rei veritas melius sciri poterit, & qui nec A. nec I. aliqua affinitate attingunt, ad recognoscend' super sacramentum suum si W. consanguineus praed' A. cujus haeres ipse est, fuit seisitus de manerio de R. cum pertinentiis in dominico suo ut de feodo die quo obiit, quod idem A. in curia nostra coram justitiariis n̄ris apud Westm' clamat ut jus suum versus eum, sicut idem A. dicit, vel non sicut praed' I dicit, quia tam praed' I quàm praed' A. inter quos inde contentio est, posuerunt se in juratam illam. Et habeas ibi nomina juratorum & hoc breve. T. &c.*"

And the form of a writ *ad inquirendum de damnis* was in these words:

"*Rex vic' salutem. Ostensum est nobis ex parte P. de L. quòd cum B. de S. in curia nostra, &c. sum' esset ad respondend' eidem P. de placito quare cepit unum equum ipsius Petri in separali ipsius Petri, & eum injustè detinuit contra vadium & pleg', & idem B. venisset in eadem curia & dixisset quòd ipse cepit averia illa in damno suo pascentia separalem pasturam ipsius Bernardi, & partes hinc inde posuissent se in juratam patriae, per quam postea in eadem curia nostra convictum fuit quòd praed' Bernardus averia*

*cepit in damno suo in separali pastura ipsius Bernardi, ita quòd idem Bernardus per considerationem curiae nostrae haberet retornum averiorum praedictorum : Praefatus Bernardus licèt praedictus Petrus rationabiles & sufficientes emend' pro damnis & transgressione prœdictis saepius ei obtulerit, praedicta averia detinet imparcata, contra legem & consuetudinem regni nostri, ad damnum ipsius Petri non modicum & gravamen. Et quia nolumus quòd praedictus Petrus injurietur in hac parte, tibi praecipimus quòd in praesentia eorundem Petri & Bernardi ad hoc praemonitorum si interesse voluerint, per sacramentum probor̄ & legalium hominum de visinetu illo neutri parti suspector̄, diligenter inquiras quae damna praedictus Bernardus habuit occasione transgressionis praedictae. Et quàm citiùs dictus Petrus eidem P. satisfecerit de damno illius juxta taxationem eorundem juratorum, praedicto averia eidem Petro sine dilatione liberari facias, juxta 'eundem valorem & precium cujus fuerunt tempore quo fuerunt eidem Bernardo retornata. Et qualiter, &c. Et habeas, &c."*

It is evident, in the first place, that the purpose and the effect of the latter writ are different from the purpose and the effect of the former ; since otherwise there would be no need of more than one writ. And a comparison of the two discloses differences in several particulars. The number of a trial jury is fixed at twelve, while the number of jurors is not determined in the case of a jury called merely to assess damages which is to be done merely "*per sacramentum probor (um) et legalium hominum*" (by the oaths of good and lawful men), the number of whom was determined by the sheriff at his pleasure, as will later appear. The precept of the writ in the former case summons a jury "*per quos rei veritas melius sciri poterit*" (by whom the truth of the matter may be more clearly known), and who are summoned "*ad recognoscendum super sacramentum suum*" (to determine upon *their* oath) as between the parties "*inter quos inde contentio est*" (between whom there is an issue), and of whom it is said "*posuerunt se in juratam illam*" (they have placed themselves upon that jury).

In the latter the precept of the writ is not to the jurors to determine, but to the "*vice comes*" (sheriff), that he (the sheriff) should diligently inquire ("*Praecipimus tibi . . . quod diligenter inquiras*") (we command *you* . . . that *you* diligently enquire);

and there is no statement of any issue remaining between the parties, but rather a recital in effect that the issue has been hitherto determined ("*Et partes hinc inde posuissent se in juratam patriae per quam postea in eadem curia nostra convictum fuit quod, &c.*") ("and thereafter the parties placed themselves upon a jury of the country, by whom it was later found that,") etc.

Again, the sole purpose of the inquiry is to inform the court of the injury done the plaintiff by the act which it has already been found that the defendant committed. ("*Quia nolumus quod praedictus Petrus injurietur in hac parte*") (because we are unwilling that the aforesaid (plaintiff) should sustain injury in this behalf.) Neither should it escape observation that in the former case the jurors are to appear before the judges on a certain day ("*coram justitiariis n (os) tris apud Westm'a die*"), while in the latter the sheriff is himself required to execute the inquiry in the presence of the parties only, who, being notified, may attend if they choose so to do, "*in praesentia eorundem P. et B. ad hoc praemonitorum si interesse voluerint.*" See *Matthew* v. *Hassel*, Mich. 31 and 32 Eliz. Q. B. Cro. Eliz. 144 (1590); Mich. 10 Wm. 3; *Northcott* v. *Underhill*, 1 Ld. Raym. 388 (1699).

Thus by the writ of *venire facias* the fact about which there is a "*contentio*" between the parties is to be determined by the jurors to whom the parties themselves have referred the determination of the fact; while by the writ of inquiry "*De Damnis*," an inquiry and report are to be made by the "*vice-comes*" (sheriff), upon the order of the court, with leave to the parties to attend the hearing if they see fit to do so.

Before considering the effect of the finding of a jury on a writ of inquiry of damages, such as is mentioned in the act passed by the General Assembly of this colony in 1767, *supra*, it is instructive to ascertain the number of jurors composing a jury to consider such questions and how their number was determined.

In Spellman's *Glossarium* (*editio tertia*, 1687) *sub voce jurata*, it is said : "*Personarum numerus non idem est in unaquaque jurata.   . . .   In Brevi enim ad inquirendum de damnis  . . . 8 solummodo habeantur.*"

And in Fitz Herbert's *Natura Brevium*, of which Lord Coke says that it is "an exact book, exquisitely penned," and which was compiled in 1534, while the author was one of the judges of the Common Pleas in the reign of Henry VIII, it is stated (8th ed. 107 (1755) : that in waste the "Writ of Inquiry is awarded by the Court *ex officio per sacramentum proborum*," etc. And "the Sheriff

may make the Inquiry by the Oaths of Six or Eight persons of the Waste and he is not bound to take Twelve Persons," upon which Chief Justice Hale observes, in referring to Brooke's Abr. Collusions, 18: "Upon a Writ of Inquiry of Waste for an abbot *Quale jus* shall issue, which proves it is no Verdict but an Inquiry."

In *King* v. *Fitch*, Cro. Car. 414 (1636), in the reign of Charles I, a writ of inquiry of waste by thirteen jurors was held good, wherein it was conceded that writs of inquiry were usually executed by more than twelve jurors " at the sheriff's pleasure, for that is but a mere inquest of office." And see 2 Rolle's Abr. 673, 674.

In the reign of Charles II the number of jurors on writs of inquiry of damages seems to have been frequently but two. In 1671, eight years after the granting of the charter of 1663 to this colony, and nearly forty years after the creation of the "General Court of Tryalls" in 1647 by the General Assembly acting under the Warwick charter of 1644, there is reported a case (1 Ventr. 113) in which the Court of King's Bench refused to sustain an assessment of damages made on a writ of inquiry by a jury of two, although "custom alleged to warrant it," the report continuing: "And it was resolved by the Court That there cannot be less than Twelve, though the Writ of Enquiry saith only '*per sacramentum proborum et legalium hominum*' and not '*duodecim*,' as in a *Venire*." And later, in the celebrated case of *Duke of York* v. *Sir Titus Oates*, in the Court of King's Bench, in an action of slander upon the *Statute De Scandalis Magnatum*, for accusing the plaintiff of being a traitor, and which was tried in 1684 (3 St. Tr. 987), the defendant suffered default, a writ of inquiry of damages was issued, and in the course of the proceedings thereon the under sheriff inquired of the court: " Will you please to have any more than twelve sworn?" To which the Lord Chief Justice replied: " How many do you use to have? Pray swear an odd number, as you used to do." And the under sheriff answered: "Then I will swear Three more and that will be just Fifteen." And this jury of fifteen assessed the plaintiff's damages at £100,000. And an examination of the report shows that the writ to the sheriff commanded him " that by the Oaths of good and Lawful Men of your Bailiwick you diligently enquire what damages," etc., and that the number of jurors was not prescribed, but was determined by the sheriff at his pleasure.

And in the reign of George II it was held in the Court of King's Bench, in *Chester* v. *Crawley*, decided in 1741 (2 Str. 1159): "The

execution of a writ of inquiry before fourteen jurors was held good, for it is but an inquest of office whereon no attaint lies."

While the proceeding by writ of attaint is now abolished, yet it was expressly authorized in Rhode Island by an act of the General Assembly passed in 1647, as will later be seen.

And in Duncombe, Trials Per Pais (6th ed. 1725), it is stated (Chapter 6, " Of The Number of Jurors ") as follows : " And the Law is so precise in this Number of Twelve that if the Trial be by more or less it is a Mis-trial : but in Inquests of Office as a Writ of Waste, there less than Twelve may serve." Fitz. N. B. 107 C. " And in Writs to enquire of Damages the just Number of Twelve is not requisite, for they may be over or under ; and so it was resolved, Trin. 1651, B. R. *Abbot versus Holt*, that the Sheriff ought (in Writs of Inquiry) to summon Twelve by their names. Yet Damages assessed by a less Number is sufficiènt, and in the Writ to the Sheriff *quod ipse inquirat per sacramentum proborum hominum*, omitting (*duodecim*) it's good and usual."

Such being the law of England as to the number of jurors on the execution of a writ of inquiry of damages for more than a hundred years after the founding of this colony, and for nearly a century after the creation of the " General Court of Tryalls " in 1647, we proceed to consider the nature and effect of such an inquiry when made.

Says Mr. Justice Holmes (The Common Law, p. 264) of the reign of Edward III (1327–1377) : " This reign may be taken as representing the time when the divisions and rules of procedure were established which have lasted until the present day."

Accordingly, in the Year Book 21, Edw. III, fol. LVII (1348), upon the question of assessing damages in replevin of certain animals, William de Thorpe, then chief justice, said :

" Sp rel poynt q fondes ure reaso pur r que la pris fuit conu et la quatity des bestes ieo die q la court duist auer taxe les dam et nemy 1 enquest en ceo cas," later adding that an attaint would not lie for a false verdict in an inquest of office, but only where issue was joined by the parties " et ceo ne puit il nuge au si 1 enqst ne fuit pris al mis des parties, et al nuys des parties nous ne poio' my enquerre car les parties fuer a issue spr un certein point, ql point est tromue issint q nul aut issue e e pris euf eux."

Here is the plain declaration, first, that when the taking and the number of animals taken were both admitted, then the question of damages was a question for the court and not for the jury ; and the further distinction is clearly made that, where parties are at

ssue and that issue is determined by the jury, no other matter is
to be otherwise determined.   And see *Ibid*, fol. 2.

In the Year Book 22, Edw. III, fol. XI (1349), in "un enqst en
bre de trs port p un A de batry," the plaintiff, being dissatisfied
with the amount awarded by the inquest, prayed the court to in-
crease the amount " p loure tax," and the court, upon observing that
" touts ses dotes fuerunt coupes oustre JJ," and after examining the
record at *nisi prius*, decided (per Hill) " eucress sr les dam a X marr
oustre les xx marris," thus affirming the power of the court to dis-
regard the finding of the jury thereon.

In the Year Book 39, Edw. III, fol. 20 (1366), is recorded a case
in which plaintiff sued in trespass for an assault and the defendant
pleaded " ryen coulpable," and was found guilty at *nisi prius*.   The
plaintiff claimed a mayhem by the assault " et les justices demand-
ont del enquest sil aunyt le Mayheme a mesme le temps," and he was
awarded by the jury £XVIII damages.   The *nisi prius* record
being returned " en banke," " le plagutyfe monstra le maheyme a les
justices del banke, et pria que les damages fuer taxes a pluis haute,
pur r que il fuit troue per udit que le def. fuit coulp, et que il prist l'
maheyme a rel temps et ont taxes les damag. forsqu a xviii li, qux
damages ne fuer pas sufficient pur les damages q il auoit.   Si agard
l' court que il recoua les damages taxes p l enquest, et ouster XXJJ li
—taxes p le court, q amount en tout a xl li."

It will be noted that the court more than doubled the damages
awarded by the jury of " enquest" as to the mayhem "*super
visum vulneris.*"

In Year Book 2, H. IV, fol. 2 (1401), it was said by Rickhyl:
" Quant home ad recouer terre riens p defaulte come en briefe de
cosinage ou en auter briefe ou &c. et briefe issist al uicount denquerer
des damages cео nest que un enqst d'office."   And see also 3 H. IV,
fol. 4 (1402).

But in Year Book 7, H. IV, fol. 31 (1406), W. Gervais brought a
writ of conspiracy against Hammond de Claxton and others for
conspiracy to indict Gervais, and later the defendants made de-
fault and the plaintiff had a writ of inquiry " al uicount pur enquerer
des dam."   " Et ore le uicount return les dam a xl li."

And thereupon Gascoigne, chief justice, said to Gervais: " Jl
semble a no' que les dam sount trop haut taxes et pur ceo coe bien
uoilles releasser quar auxibn come no' poiom' encresc dam nous auomus
poair d'abbreger solonque nre conscience—<u>quod nota bene.</u>   Et auter-
ment le court uoillet auer abbregge solonque lour conscience," etc.

The power is here exercised by the court of King's Bench, and on its own motion to reduce damages awarded by a jury in a defaulted case; and the right to increase or to diminish damages in such cases is here unqualifiedly affirmed.

In the Year Book 8, H. IV, fol. XXIII (1407), the plaintiff received damages after trial by a jury at *nisi prius*, in trespass for assault and battery; and claimed a mayhem from the battery and prayed increased damages; and the chief justice in King's Bench questioned the power of the Common Pleas at *nisi prius* to increase damages, stating that the plaintiff "issuit q̄ le pl', poit ven eins en propre person ou devant ascun de nous copaignons en pais pur mrer son mayha et p rest uoye il poit este eide, et ita factum fuit," etc., thus granting the prayer, upon the plaintiff showing his mayhem to some justice of the King's Bench.

And in the Year book 9, H. IV, fol. 1 (1408), damages were assessed by the court "p inspeccion" in trespass for assault and mayhem, the report stating that the plaintiff "fuit fait venir en le place de e view de court daiudger ses damages p inspeccion et la court agard q il recouerist CC marc pur ses dam a double solonque l' ordinance del parlement," etc.

In Year Book XI, H. IV, fol. 10 (1410), the plaintiff in replevin in the King's Bench received damages on issue tried by a jury of property in defendant. "Et le pl' pria s̄ iudgement et le court ne uoille done son iudgement sinon que il uoudre rel' parcel des damages, quar les Iustices dit que per mesme le ley que ils poent encreser per mesme le ley ils poent abbregger per q le pleintife pria son iudgement solonc le descrecion des Iustices, per que il fuit agard que il rec x li, et le rem le partye rel'," thus again affirming the right to reduce damages even after trial on issue joined.

But in the same year, in Year Book XI, fol. 65, in an action of trespass for an assault, while the Court of Common Pleas in that case thought it expedient to have the damages inquired of by a jury, yet the report of the case concludes: "Et nota que le Court tenuit que ils puissent taxer les damages sils uoillet," etc.

And in Year Book XIV, H. IV, fol. 2 (1413), in the Common Pleas Finch recovered damages, taxed by the court, for a wrongful taking of his property, against Cornewall and others, upon defendant's default, after the case had been held for advisement. "Et les Iustices disoient que il uoillent estre avises et puis a autr jour agard' fuit que le pl' rec' ces dammages taxes per la court a IIII li, quod nota. Et nota q il ne rec my dam solonc r q il ad accompte."

And in the same year (fol. 9), in replevin: "Et puis ex assesu eim Justic il agard q le pl' rec ses dam a 5 marc, qd nota," and Skrene (of counsel) objected, and said: "p la Jnqsicio les dam ne sot taxes q a 30s. p q uo', ne purres enlarger les dam." But Hill, B., speaking for the court, replied: "No' puissom' agard dam sans ascu enqrer, p q l enqst ne forsqu de no' faie destr apris des dam, qd nota." And here the court again affirmed its power to change the award of damages made by the jury and to make an award without an inquiry by the jury, since the inquiry is only to apprize the court concerning the damages.

In the Year Book 3, H. VI, fol. 29 (1425), it was said by Martin, B., of the finding of a jury on the question of waste: "Car cel inqsition est grand', et p(l)uis haut q un enqst d'offic car ceo que serra trouue per cel inqsition le iug serra don solemt et le pty lie per cel iudg en inquisition de touts iours, et il puit estr que nul serra trouue per cel inquisition issint donqs le iudg serra don encont le pl' et issint en maner cel enquest en substanc e auxi fort si com lou un enquest e ioiue entre partie et partie."

But of a writ of inquiry as to damages in an action of *trespass*, after demurrer overruled by the court, he continues: "Nous puissomus estier lequel nous m uoillomus taxer les damages per nostre discretion, et sur ceo don iudgement ou ensement de nous pur maund' un briefe al uic. pur enqrer des damages, etc. et nient obstant le uic returne des damages al certeine iour no' puisso' estier le quel nous uoillomus don iudgement sur cel ou enlarger les damages ou abbregger et issint uarier de cel inquisition, en quel cas cel inquisition nest merement d'office, car il non ligat, neque soluit." And concludes: "Et issint may semble il ad graunde diuersitie per enter les cases."

Here it is laid down in the most explicit manner, and in the clearest way, that in trespass the court may either tax the damages itself, or, if it sees fit to call in a jury to pass upon the question, may increase or diminish the amount so found; the finding of the jury being merely an inquest of office which the court could depart from at its discretion. And see Year Book 7, Hen. VI, fol. 31 (1429).

In the Year Book 8, H. VI, fol. V (1430), is recorded the case of the default of a garnishee in detinue after issue joined. The jury on the writ of inquiry returned greater damages than the plaintiff claimed in his complaint against him, and then the plaintiff prayed judgment. And *Martin*, B., said: "Mesque que nous ne doncromus iudgemet sur le uerdict nous le donnromus per defaut. Et ueritie est

que l enquest ne devoit riens auer enquis del principal issue, mes que le iudgemet doit auer estre done sur le defaut en ceo case, et issint serra; issint le prender denquest a ceo point ne fuit que surplusage; mes quant il fuit condempnable per defaut, les Justices poient auer done iudgement del principal et auera m̃ taxe les dammages, et auxynt poyent auer agard' br denquer des damages, per lour justification, en discharge de lour conscience. . . . "Et Martin et tota curia, que le iudgement serra done sur le defaut. Et Martin dyst que quant home serra condempn per iudgement sur le defaut les Justices poient taxer les dammages, mes pur le plein notic del tort est use denquerer des dammages per enquest." And in continuing the. decision (*Ibid,* fol. XI), *Paston,* B., said: "Car l enquest nest que nostre information." Again affirming the right of the court to assess the damages without a jury, and stating that the basis of the judgment of the court was the default of the defendant and not the finding of the jury. Here it will be seen that the court directly declares that it does not base its judgment upon the verdict of the jury as to the amount of damages, but upon the default of the defendant on the principal issue. And the importance of this distinction should not be overlooked. Again, it is further determined that on the assessment of damages the jury has no concern with the principal issue and that its finding on that question is "surplusage." And, moreover, it is clearly decided that the justices may themselves award the damages, or suffer the jury to inquire concerning damages for their justification and to enlighten their consciences; but that it is only matter of *practice,* and not matter of right, which permits the jury to inquire concerning damages when the defendant has suffered a default.

In the Year Book 19, H. VI, fol. VIII (1441), one of three defendants in trespass made default and the others justified the alleged trespass as his servant, to whom they averred the plaintiff had sold the goods in question. In the argument as to the county in which the writ of inquiry as to damages against the defaulting defendant should be executed, it was said by the court: "Si br isser denquer des dam cel enquest nest q un enquest d'office . . . et ne poies au attaint us eux, . . . issint sr iry en nr discrec' roment uoillomus faire," and (fol. X) thereafter the writ of inquiry was executed and returned into court and the plaintiff prayed judgment, and Hody, chief justice of the King's Bench, said: "Ceux damages sont trop grand' pur le tierce par q entaunt q ceo ne fuit forsqu un enquest d'offic de quel le def. ne puit auer atteint pur

outragious damages solonqu le statut come il purra sil passera del principal, et auxi quant vous ag brief al uir denquerer des damages vous puisses auer agarder damages adonques solonqu nostre discrer et issint poies faire a ore pur r q il nest q enquest d'offire." And after reducing the damages "*ex assesu socioru* (m) *suoru*(m)," the report continues : " Quad nota, ou les iustices ont amesnus les damages taxes par l enquest," adding : " Mes auter serra si mesme l enquest ust passe sur le principal car donques ils nussent eue tiel poiar de abriger les damages come deuant ne d'enlarger nul damages forsqu soulement des costages." " Mes nient d'enlarger damages quant al principal et si l enquest don, outragious damages les iustic' ne amesur eux purra surcesser de lour iugemt coe fugt fait par Martin, Iustice, anno xiiii, mesme le roy." " Et nota diu(er)sitatem."

Upon this case it is to be noted that the action was trespass *de bonis asportatis*, in which the damages are uncertain ; that after default of one of the three defendants and a writ of inquiry executed as to the damages, the court of its own motion pronounced the finding of the jury to be too great, and then of its own motion proceeded itself to determine and reduce the damages, observing that in such a case the finding of the jury was but an inquest of office and that the court could award damages at its discretion ; at the same time distinguishing the case at bar from a case where the principal issue was determined by the jury, in which latter case power to increase or diminish damages was disclaimed.

In Year Book 32, H. VI, fol. 1 (1454), it is said : " Briefe de Dette fuit porte et les parties fuerunt al issue et les iourours chaunter pur le plauntif as damages de (xx) ui s uiii d et les costages de xx s. Wangforde pria que ses damages poiet estr encrease et issi ffuer pur q Fulthorpe dit ; Recoues uostr dette et uostr damage de xxui s, uiii d taxes par l enquest et xiii s, iiii d ouster taxes par le court," thus increasing the finding of the jury by one-half of debt and costs.

In Year Book 34, H. VI, fol. 24 (1456), in the Exchequer Chamber, Fortescue said that the awarding judgment on default in debt, and the inquiry of damages by a jury on default in trespass, rested merely on the usage of the court, and had no other reason, and that, indeed, none could give a reason for the difference in practice, as follows :

" Et l'usage fait en ley et sans aut reason qr l'usage en bre de det est que si le def. pled un arquitance ou reles en barr et le pl' dedit le fait issint q ils sont a issue etc. et apres le def. face defaut il serra rodempne, &c. Mes si le def. en bre de Tus pled un reles et le pl' dedit,

etc. et apres issue, &c. le def. face defant; en rest cas ne serra mes un enqst p def. et nul condempnation come serea en le bre de det &c. mes nul sauer dire le diuersitie de reason p e tre l un et l auter mes l'usage tm."

From which it appears that the action of the court in these cases was solely a matter of practice, and not a matter of right.

In Year Book 39, H. VI, fol. 1 (1461), trespass was brought against several defendants who pleaded in bar, and one of them made default; and the question was whether a writ of inquiry of damages should issue against the defaulting defendant before the trial of the issue joined between the plaintiff and other defendants. And *Moyle* said: "Si le bre isser ore pur enquer les dam nest forsqu enquest d'office et nemy al myse des parties," and that where damages are taxed by a jury on issue joined between the parties an attaint would lie. "Mes del enquest d'office nil home auera atteynt et issint pur charger eux qui ont pled' al issue des damages assesses p enquest d'office serra grond' mischiefe."

In Year Book 16, Edward IV, fol. 1 (1476), is the following case: "Dette sur un obligac le def. dit q il fuit un lay home et nient letr et re obligac fuit lye a luy sur certeine cond', et issint son oblig. sans condicion nient a fait, et sur ceo issue fuit prise et al iure fuit don en euidence que le def. fuit home letr. Et donqs le def. dit que le verite fuit et est que il est letter home, mes en fait le pl' promist le def. que il ne voile suer le oblig. si le defendaunt ne voile enchase en le park le pl' puis cel temps issint est graunde conscience en rest matr pur les dam et auxi pur le duety, et sur c l enquest fuer charge per les costages et damag. et puis il reuient al barre a dire lour verdit Sandes, le clerke, dit al Crier dd' le pl'. Catesby e ne besoign my, car ceo n'est a ore forsqu un enquest d'office quant le point del issue est conu et les Justie sils voient purr au taxe les dam, per que le iure taxe les dam et costages et le pl' ne fuit my dd', qd nota." Here the court again affirms its power to assess damages when the point at issue is admitted, and restates the law as to the effect of the finding of a jury on the question of damages where liability is admitted, as it obviously is admitted, by a default.

Leaving the Year Books, and observing more recent decisions, we find that the distinction is more clearly made between the execution of a writ of inquiry of damages and a verdict in its proper signification.

In Pasch, 29 Eliz. Gouldsborough, 49 (1587), it was determined, in an action of trespass for an assault, that the finding of a jury on

a writ of inquiry in a defaulted case was not a *verdict,* " for this shall not be said a verdict; whereto the court agreed, for a verdict is that which is put in issue by the joyning of the parties." And in Mich. 37 and 38 Eliz. it was again said, in *Courtier* v. *Barret & Sampson,* Cro. Eliz. 412 (1595), by the whole Court of King's Bench, in a case of replevin where the parties were at issue and the plaintiff was nonsuited after evidence and damages were assessed by jury for the avowant, that " here the plaintiff being nonsuited there is not any verdict given ; but, in that whereof the jury are to enquire of damages their verdict is but an office of inquest and no verdict," etc.   And see Ireland's Case Cro. Eliz. 339 (1594), and *Grey* v. *Willoughby,* Moore, 465, pl. 657 (1595).

And in Year Book 47, Edward III, fol. 19 (1374), it was said by *Finchden,* chief justice:   " Ne l enquest ne fuit iny charge de ceo que la party mesme auoit conus et sic est troue encountre luy."

An even more positive recognition of the essential difference between a verdict of a jury in a trial on issue joined and the finding as to damages in a writ of inquiry is contained in the Act of Parliament passed in the 4th year of Queen Anne's reign (1705), 4 Anne, cap. XVI, and entitled—" An Act for the Amendment of the Law and the better Advancement of Justice," the second section of which is as follows :

" And be it further Enacted by the Authority aforesaid, That from and after the said first Day of Trinity Term (1706) all the Statutes of Jeofails shall be extended to Judgments which shall at any Time afterwards be entred upon Confession, *Nihil dicit,* or *Non sum informatus* in any Court of Record ; and no such Judgment shall be reversed, nor any Judgment upon any Writ of Enquiry of Damages executed thereon be staid or reversed for or by reason of any Imperfection, Omission, Defect, Matter or Thing whatsoever, which would have been aided and cured by any of the said Statutes of Jeofails in case a Verdict of twelve Men had been given in the said Action or Suit, so as there be an original Writ or Bill and Warrants of Attorney duly filed according to the Law as it is now used."

It will be noticed here that a " Verdict of twelve Men " is contrasted in this act with a " Writ of Enquiry of Damages Executed," and that the provisions of the statutes concerning the former are " extended " to the latter, thus clearly recognizing as well as preserving the two methods of procedure and being a Parliamentary recognition that the finding in the latter case was a different mat-

ter from a "Verdict of twelve Men." And see *Mallory* v. *Jennings*, in the King's Bench, Mich. 4, Geo. II, Fitzgibbon, 162 (1731).

So in *Foster* v. *Jackson*, Trin. 13 Jac. Hob. 52 (1616), it is said of a verdict: "First lay this for a Ground, that if the Jury find any Thing, that is meerly out of the Issue, that such a Verdict, for so much is utterly void and of no Force, though it conclude in general, for or against the Plaintiff or the Defendant, whereof the Reason is plain, which is, that the Jurors are Tryers of Matter of Fact put in Issue between the Parties, and their Oath, which contains their Commission is, that they shall truly try the Issue between Party and Party. . . . So that whatsoever they do try besides the Issue is *per non juratos*, as a Cause judged by the Court, that hath no Jurisdiction of the Cause *coram non judice*, and utterly void, for a Verdict must not be to the Action, that might have been pleaded, but to the Issue, which is pleaded, and in their Charge. . . . And so upon the Matter, if that extravagant Part of the Verdict be false, it is no Purjury, neither doth any Attaint lie upon it, for there is no Party grieved nor any Thing to be restored, neither can it be used as in Evidence in any other Tryal, because there is no Redress if it be False.' . . . For Jurors are bound to their Issues, but Judges have Power over the whole Matter, and that hath also his Bounds, as to the Matter within the Record, not at large."

In *Sir Francis Goodwin* v. *Welsh & Over*, Pasch. 7, Jac. Yelv. 152 (1610); the plaintiff recovered damages in trespass *de bonis asportatis* against two defendants by default. And it was held: "And by all the Justices, they themselves as judges, if they would, might in these cases assess damages without issuing any writ, for it issues only *quia nescitur quae damna;* but if they will trouble themselves with the assessment of damages, they may. But it is otherwise in the case of *non cul.* pleaded, for there the trespass is denied which must be tried by the jury and there the property and the value also ought to be proved." And in a note to this case by the late Theron Metcalf, in the 1st American Edition of Yelverton's Reports, published in 1820, it is stated: "In Rhode Island, the court on default and demurrer assess damages in all actions whether of tort or of contract." See also, to the same effect, 1 Brownlow & Goldsborough, 214, and Cro. Jac. 220.

Under the protectorate of Cromwell, in 1651, was decided the case of *Davis* v. *Lord Foliot* (Banc. Sup.), Style, 310. Davis sued Lord Foliot for an assault, and on a writ of inquiry £200 damages were awarded by the jury. "The Plaintiff moved the Court for a

new writ because by reason of the willfulness of the Jury the damages were found too small." "Rolle, Chief Justice, answered, though we grant not a new writ, yet we can increase the damages upon view of the wound, and here appears to have been a foul Battery by the dagger produced in the Court and by the party himself that is wounded, and it is not fit that a wilful Jury should prejudice the party, therefore either consent to a new writ or else bring your witnesses on both sides and we will hear the motion again." And later, "Rolle, Chief Justice, said—3 things are considerable. 1. Whether the court can increase the damages; 2ly, Whether the wound be apparent; and 3ly, Whether the damages given be too small. The Court upon view of the party and examination of Chirurgeons and Witnesses on both sides upon Oath, did conclude that they might increase the damages and that the wound was apparent and that the damages were too small, and therefore they increased them to £400 and said they would not increase them more because they could not inquire into all the circumstances of the fact as the jury might, but they thought fitting to encrease them in some proportion because the offence was great and such outragious Acts are not to be slightly punished." And see *Dames* v. *Rock*, Mich. 1 Car. Bendloe, 158 (1625). And *Wolf* v. *Meggs*, Cro. Eliz. 544 (1597); *Hooper* v. *Pope*, 2 Latch. 223 (1626); and *Mallet and Ferrer's Case*, Hil. 30 Eliz., 1 Leon. 139 (1588); and *Tripcony's Case*, Mich. 1 Philip & Mary, 1 Dyer, 105a (1554); *More's Case* (1674), Freeman, 173; *Burton* v. *Baynes*, Mich. 7, Geo. II, Barnes, 153 (1733); *Austin* v. *Hilliers et al.*, Pasch. 17, Car. 11, Hard. 408 (1666).

In the reign of William III (1695) was decided, in the King's Bench, *Sir James Harbert's Case*. Skinner, 595. Here the plaintiff in replevin became nonsuit after joinder in trial and evidence to a jury, and the jury were discharged without assessing the defendant's damages. And at a later day, on a motion for a writ of inquiry for that purpose, it was said by Holt, chief justice, "The Jury here are discharged from giving their Verdict by the Nonsuit; and therefore, if they had given a Verdict for the Damages this had been but as an *Inquest of Office* upon which no Attaint would lie if the Damages had been excessive." . . . "But where the Jury gives a Verdict and does not give Damages there such a Defect shall not be supplied; for if the Jury had given Damages this was as Part of their Verdict upon which an Attaint lay if they are excessive, and therefore if this shall be supplied by a Writ of Enquiry which is but an Inquest of Office, if the Dam-

ages are excessive the Party shall be oppressed without the Benefit of an Attaint." And see 1 Salk. 205; 1 Ld. Raym. 59; 12 Mod. Rep. Case, 150. In *Herbert* v. *Waters* (Carth. 362), decided in the Court of King's Bench in 1695, the rule is thus stated as to a writ of inquiry of damages to an avowant upon a nonsuit in replevin:

"Where the Matter omitted to be inquired by the principal Jury is such as goes to the very Point of the Issue, and upon which if 'tis found by the Jury, an Attaint will lie against them by the Party, if they have given a false Verdict; there such Matter cannot be supplied by a Writ of Inquiry, because thereby the Plaintiff may lose his Action of Attaint, which will not lie upon an Inquest of Office.

"But where the Matter omitted to be inquired by the principal Jury doth not go to the Point in Issue or necessary Consequence thereof, but are Things meerly collateral, as Damages are in this Case, and the Four usual Inquiries on a *Quare Impedit*, such may be supplied by a subsequent Writ of Inquiry, without any Damage to the Party; because if the same had been inquired into by the principal Jury, it would have been (as to those Particulars) no more than an Inquest of Office, upon which an Attaint will not lie." *Brampton's Case*, Mich. 13 Jac. 1 Rolle Rep. 272 (1616); *Cheyney's Case*, 10 Coke Rep. 118; *Sir John Heydon's Case*, Trin. Jac. 11 Coke Rep. 5 (1613).

During the same reign (Hil. Term, 8 and 9, Will. III (1696),) was also decided *Cook* v. *Beal*, 1 Ld. Raym. 176. This was trespass for an assault, and not guilty pleaded, and verdict for plaintiff, who later moved for an increase of the damages upon affidavit that he had partially lost the sight of his eye by the assault; and therefore it was "Resolved that the court may increase the damages if the wound be apparent though it be not a maim." . . . "And Powell, Justice, said that Holt, Chief Justice, was of that opinion." . . . "And he (Powell, J.,) said that the court might increase the damages upon a writ of enquiry because that was but a bare inquest of office." And see 3 Salk. 115. And in the following cases the assessment of damages by a jury on a writ of inquiry was set aside by the Court of King's Bench.

*Woodford* v. *Eades*, 1 Str. 425 (1721), because damages were too small; and for the same cause in *Hall* v. *Stone*, 1 Str. 515 (1722); and in *Markham* v. *Middleton*, 2 Str. 1259 (1746); *Parr* v. *Purbeck*, 8 Mod. Rep. 196 (1724).

In *Beardmore* v. *Carrington et al.*, 2 Wils. 244 (1764), it was said by the court, in considering the question of damages awarded in an action of trespass and false imprisonment after joinder on the

general issue and trial to a jury: "There is also a difference be-
tween a principal verdict of a jury and a writ of inquiry of dam-
ages, the latter being only an inquest of office to inform the con-
science of the court and which they might have assessed them-
selves without any inquest at all."

And in *Hewitt* v. *Mantel*, 2 Wils. 372 (1768), it was said, by *Wil-
mot*, chief justice: "The taking of the inquisition and entering
final judgment were only the conclusion and necessary conse-
quence of the interlocutory judgment, for the court themselves, if
they had so pleased, might upon the interlocutory judgment, have
assessed the damages and thereupon given final judgment before
Bibbins's became bankrupts, and the inquisition is only a matter
of course taken to inform the conscience of the court."

Again in *Bruce* v. *Rawlins*, 3 Wils. 61 (1770), the plaintiff recov-
ered damages in trespass by default for breaking and entering
plaintiff's house and searching his effects. The court said, in con-
sidering the damages assessed by the jury on the writ of inquiry:
" *Wilmot*, Chief Justice. This is an inquest of office to inform the
conscience of the court, who, if they please, may themselves assess
the damages." And see *Coleman* v. *Mawby et al.*, 2 Str. 854 (1730);
and also *Creswick* v. *Saunders*, 34 Car. II, Shower 200, case 199
(1682).

In Rhode Island the act of the General Assembly, passed in
1647, creating the "Generall Court of Tryalls" made provision for
the use of writs of inquiry of damages in defaulted cases, and also
provided for the proceeding by writ of attaint for a false verdict,
as follows (1 R. I. Col. Rec. p. 196):

"But in case after a declaration is filed in expectation of an
answer, or to make his defence, and he doth not, then the plaintiff
taketh him by default, which is called confessing the action, and
then the Recorder's office shall be, to enter and record a *Nihil
dicit* (*id est*), he saith nothing thereon, and so shall he send out a
writ of enquiry of dammages unto the Towne where the defendant
lives. And the head officer of the Towne at the next Towne Court,
shall enquire of damages, and by a writ of destringes to the Sar-
gant, shall cause the defendant for that purpose to come to the
Court, and in case he appear not, he shall forfeit the distraint,
and the head officer of the Towne may distraine again and again."
This provision was changed in 1650 (1 R. I. Col. Rec. 224) by a
provision: "That in case a *Nihil dicit* be taken in any Courte, the
Jury of that Courte shall make inquirie," apparently extending to
all courts the provisions of the act of 1648, relative to the "Gen-

eral Court of Tryalls " only, and which specified (p. 211), that in case of a *Nihil dicit* in that court " that then the Jury Empanelled for the said Court shall enquire of Damages " etc.   And also p. 200:

" And be it further enacted by the authority of this present Assemblie, that if any false verdict be given in any action, suit or demand, either in this or in any other Court of the Colonie, in anything personall as Trespass, Debt, Difference, &c., the party grieved shall have a writ of attaint out of this Court of the Colonie, putting in sufficient security, against each partie giving in such an untrue verdict, whereby ye parties shall be summoned by great distresses, and in case the thing in demand and the verdict, surmounts forty pounds, to the three able men of each Towne (Providence, Newport, Portsmouth and Warwick) shall be added twelve of the same Towne where the Colonie Court of Tryall shall be, being worth three score pounds apiece, if such and so many are to be had, and in case these find they gave an untrue verdict, every one of the former inquest shall forfeit twenty pounds, ten whereof is the King's custome, and ten pounds shall go to the partie grieved, that sues for it; he shall be also not of credence, neither shall his solemn testimony be taken in any Court, untill the Colonie release him.   But if, eyther the demand or verdict be under forty pounds, then shall the inquest be worth fifty pounds a man, and every one of the petty inquest being found guilty, shall forfeit five pounds, with the like punishment as is before specified.   See 23 Hen. VIII, 3; 37 Hen. VIII, 5.   And in case he that sues forth the writ of attaint makes it not good, every party attainted may have his action against him, and recover sufficient dammages."

But this statute applies only to " false verdicts," and its terms do not include the execution of a writ of inquiry of damages.   So, too, it provides a jury of twenty-four for the trial of cases thereunder, as does the " Act against Perjury and Untrue Verdicts," of 23 Hen. VIII, 3, enacted in 1531, and referred to therein, and which it closely follows in many particulars.

And as to " false verdicts " it was doubtless true here as in England, as was said in 1736, by the Court of King's Bench in *Barker* v. *Dixie* (2 Str. 1051):   " And new trials came in the room only of attaints as a more expeditious and easy remedy."

Prior to 1671 the records of the " Generall Court of Tryalls " are to be found with the proceedings of the General Assembly, and in 1730 it was succeeded by the Superior Court of Judicature.   The records between these dates are in our possession, and an exami-

nation of them shows that for some years it was the practice of the court to submit the question of damages in defaulted cases to a jury. The practice appears to have changed about the year 1710, for at the September term, 1709, in *Burlington* v. *Whipple* (Newport county), which was debt on a bond, upon defendant's default the damages were assessed by the court; and thereafter the latter practice gained, until, at the last term of the court before it was succeeded by the Superior Court of Judicature and Inferior Courts of Common Pleas created in 1729 (*i. e.*, March term, 1730), of 254 defaulted cases at that term, the damages in each case were assessed by the court, nor does there appear at that term a single defaulted case in which the damages were assessed by a jury. So that this may safely be said to have been the constant and established practice during the latter years of the first court created in the colony. But the act of the General Assembly specifically authorizing this method of procedure was not passed until 1767 (*supra*) and seems to have been rather a recognition of and authority for what may be termed the common law of the colony, as seems also to have been the fact in Connecticut. See *Lennon* v. *Rawitzer*, 57 Conn. 583. Indeed, it would seem that in this colony the claim was made of record as late as 1722 of a right to a trial otherwise than by a jury—that is to say, a trial by wager of law; for at the September term, 1722, of the Court of Trials at Newport, the defendant appealed from a judgment of a Justice Court in an action of detinue, whereby the plaintiff recovered judgment below for return of the property detained or in lieu thereof the defendant to pay plaintiff forty shillings. On the appeal in the Court of Trials the plaintiff below did not appear, but made default, and the court reversed the judgment below and awarded judgment in favor of the appealing defendant for costs. It is of interest to note that in this case one of this defendant's reasons of appeal is thus stated: "For that the defendant ought to have been allowed the benefit of his wager in Law, that he detaineth no Gun of the plaintiff's and thereby discharge himself, but was not;" and cites authorities. And indeed, in the case of the Abbot of Strata Mercella, 9 Coke's Rep. at p. 56, it is said by Lord Coke that "wager of law countervails a jury." . . . "Also trial may be in debt upon a simple contract, detinue, etc., either by wager of law of the defendant himself, or by jury at the defendant's election." And in 1724, in an action of detinue, the defendant's counsel, who was then the attorney-general of the colony, filed the following plea: "And the Defendant prays the Benefit of

the Law " and that the " Plaintiff's action may be barred." The defendant also pleaded non-delivery and non-detainer with prayer to the country, and the case was finally submitted to a jury who found for the defendant, the record not-showing whether the defendant so elected or not. The counsellor who advanced this claim in the former case was six years later, in 1728, appointed by the General Assembly, together with the then attorney-general, a former attorney-general, and the " General Recorder " or Secretary of State, the fourth member of the commission to revise the laws of the colony and to print the laws of the colony "now in force " (4 R. I. Col. Rec. p. 408), and which prepared the Digest of 1730, *supra.*

Even in criminal cases the court for many years acted under a statute which adjudged a respondent who did not appear, but made default, to be guilty, and then proceeded to impose sentence. The act creating the office of attorney-general, in 1650 (1 R. I. Col. Rec. 225), is as follows:

" That the Atturney Generall shall have full power to impleade any transgression of the lawe of this State in any Courte of this State; but especially to bringe all such matters of penall lawes to tryall of the Generall Courte of Tryalls, as also for the tryall of the officers in the State at the Generall Assemblies, and to impleade in the full power and authoritie of the free people of this State, their prerogatives and liberties;" and he was authorized " that upon information of transgressions or transgressors of the lawes, prerogatives and liberties of the people, and their penall lawes, he shall under hand and seale take forth summons from the President or Generall Assistants, to command any delinquent, or vehemently suspected of delinquencie in what kind so ever accordinge to the premises, to appeare at the Generall Courte, if it be thereto belonginge, or to the Generall Assemblie in those matters proper thereunto; and if any refuse to apeare at that *mandamus* in the State of England's name and the free people of this State, he shal be judged guiltie, and so proceeded with according to fine or penaltie."

In 1717, in the Court of Tryalls for Newport county, upon an indictment for illegal cohabitation, the respondent " being called in court appeared not but made default, whereupon the sentence of this court is," and then follows a fine.

And in 1724, upon an indictment for larceny, the respondent " made default, Whereupon the sentence and judgment of this court is that the said respondent Restore and pay unto said (own-

ers) three pounds ten shillings, being two-fold, and to be whipped
on your naked back on the 10th of this Inst. September, at the
Publick Whipping Post in Newport with fifteen stripes or pay a
fine of fifty shillings to the King to and for the support of the Gov-
ernment, and pay the charges of the prosecution, Conviction, &c.
And to Remain in the Custody of the Sheriff till this Sentence be
performed," and similar proceedings were had on other indictments.

In 1745, upon an indictment for uttering counterfeit money, the
respondent " being solemnly called in court did not appear."
. . . " And afterwards the said respondent was brought into
Court and by virtue of an Act of Ye General Assembly of said
Colony was to have a Trial notwithstanding the former Default."
. Here is to be found a recognition of the doctrine, which had
been advocated long before, that default even in a civil action was
not only the defendant's admission of the truth of the contention,
but that it was in itself a contemptuous and disobedient act, and
therefore blameworthy. Thus, Bracton, writing about the end of
the reign of Henry III (1272), prescribes that, upon default in a
civil action *ex delicto*, damages should be assessed by the court;
and if the defendant have no lands or goods and be not found he
should be considered as an outlaw, not indeed to suffer death or
dismemberment if captured, but nevertheless to be perpetually
imprisoned and kept from all who live in the king's peace, since
there is no greater offence than contempt and disobedience of the
king's summons.

*De Legibus Et Consuetudinibus Angliae, Lib. V. fol. 440 (Ed. of
1640):* " *Si autem placitum esset civile descendens ex delicto sicut
actio injuriarum quòd tunc per officium Justic. aestimaretur injuria
et adhibita taxatione de redditib et catallis fugientis caperetur in
manu dni Regis ad valentiam p (ro) contumacia ipsius et fieret eodem
modo sicut supra. Si autem cùm corpus non inveniatur nec terras
habuerit nec catalla ille de quo queritur, iniquum esset si justitia
remaneret vel malitia esset impunita. . . . Quia nullum majus
crimen quàm contemptus et inobedientia, omnes enim qui in regno sút
obedientes esse debent dno Regi, & ad pacem suam, & cùm vocati
vel sumoniti per Regem venire contempserint, faciut seipsos exleges
& ideo utlagari deberent, non tamen ad mortem vel membroru trun-
cationem si postea redierint, vel intercepti fuerint, cùm causa utlaga-
tionis criminalis non existat, sed ad perpetuam prisonam, vel regni
abjurationem, et à communione aliorum qui sunt ad pacem dni
Regis.*" But this is rather a statement of that which Bracton con-
sidered was the proper course to be pursued than a statement of

the law as it is to be found in the early reported cases of the Year Books.

Even after our independence of Great Britain had been declared, a similar course was pursued. In 1779 (8 R. I. Col. Rec. p. 609) there was enacted an act confiscating the estates of those who had adhered to the king and had aided his forces, and providing as follows: "And whereas it is necessary that some mode of trial should be instituted whereby to determine what estates are forfeited by force of this act and whereby those persons who may be accused of offences in this act described may have their estates defended in the best manner that their situations will admit of," and providing for the number of jurors to be drawn to attend such trials and for notice to a respondent, and that "any person or persons who have claim to the same estate in such information or complaint mentioned" might, "either in their own right or on the part and behalf of the person accused or of any person whomsoever," come and defend, "and the issue shall be tried by a jury in the known and ordinary course of law used and approved in this state, to try whether such estate demanded or any part thereof is forfeited by force of this act," etc.

In 1780, in Newport county, sundry informations were preferred by the attorney-general, alleging violations of this act and praying for a forfeiture to the State of the respondents' lands bounded and described as set forth in the informations. In the single case tried by a jury at that term the verdict was in favor of the respondent; but in 22 cases the respondent made default, and in each case judgment of forfeiture to the State of the respondent's lands was rendered by the court upon default. Inasmuch as these proceedings were had in the Superior Court of Judicature, this action of the highest court in the State in thus divesting title to real estate upon default must be accepted as "the known and ordinary course of law used and approved in this state" at that time.

By the act creating the Superior Court of Judicature it was expressly given all the powers which were vested in the Courts of Law in England; since at the June session, 1729, the General Assembly of this colony enacted "An Act for Establishing of Inferior Courts of Common Pleas in the several Counties of this Colony," to which courts were given "Cognizance of all Civil Actions arising or happening within such County Tryable at the Common Law of what Nature, Kind or Quality soever," with a right of appeal to the Supreme Court of Judicature created by the same act, to which was also given "Cognizance of all Pleas real, personal and

mixt, as also Pleas of the Crown and Causes criminal and Matters relating to the Conservation of the Peace and Punishment of Offenders and generally of all other Matters as fully and amply to all Intents and Purposes whatsoever as the Court of Common Pleas, King's Bench or Exchequer in His Majesty's Kingdom of England have or ought to have, and are Impowered to give Judgment therein and to award Execution thereon and make such necessary Rules of Practice as the Judges shall from time to time see needful," thereby conferring the same jurisdiction conferred upon the "Generall Court of Tryalls" by the act of 1666 (Digest of 1719, p. 15).

The practice in the Inferior Court of Common Pleas was from the beginning that damages should be assessed by the court, even in tort actions.

Thus at the November term, 1730, in Newport county, in an action of trespass for the unlawful taking and abuse of the plaintiff's horse, upon the defendant's default damages were assessed by the court, as was also the procedure at the same term in an action of detinue.

The first records of this court in Providence county begin with the June term, 1731. At that term in divers cases judgment was given for the plaintiff by the default of the defendant, and in each case the damages were assessed by the court, and in no case was a writ of inquiry of damages issued; and among these were fifteen cases in debt and twenty-one actions of the case. Nor was the assessment of damages by the court confined to actions *ex contractu,* since in each of the following cases the defendant made default, and in each instance the damages were assessed by the court.

In 1740, in case by bail against principal who had failed to appear in the original action and had not satisfied the judgment therein; in 1741, in trover after general issue pleaded "*et de hoc,*" etc.; in 1743, in trespass *de bonis asportatis* for entering the plaintiff's close and carrying away "229 oak rails of the plaintiff, of the value of £7, and other enormities unto the plaintiff, the defendant did then and there do," after general issue pleaded and prayer to the country; in 1743, in trespass for an assault after *son assault demesne* pleaded; in 1774, in trespass charging that defendant "did cut down and carry off from said land (of plaintiffs) Ten Timber Trees," after title pleaded from respondent's grantor by warranty deed and summons *ad warrantizandum* issued and served; in 1776, in trespass on the case against a truckman for negligence in transportation of certain goods of the plaintiff, whereby they were de-

stroyed; in 1776, in trespass for an assault, and "not guilty," pleaded and prayer to the country; and in the same year in trespass alleging that the defendant "set fire to the Brush and Leaves and other dry stuff lying on Plaintiff's land, also after 'not guilty' pleaded and prayer to the country."

The present constitution of the State took effect on the first Tuesday of May, 1843. Section 15 of article 1 contains this provision: "The right of trial by jury shall remain inviolate," and this court has held in *Bishop* v. *Tripp,* 15 R. I. 466, that this does not extend the right of jury trial, but preserves it as it was at that time. An examination of the record of the Court of Common Pleas in Providence county for the December term, 1842, which was the last term before the present constitution became operative, shows that there were 289 defaulted cases at that term, in each of which the damages were assessed by the court, and that in no defaulted case were the damages assessed by a jury. And the statute in that behalf then existing is in substance identical with the statute now in force.

Nor are decisions wanting in the courts of other States and of the United States which sustain the power of the court to assess damages in defaulted cases without the intervention of a jury.

In *Brown* v. *Von Braam,* 3 Dall. 344, the Supreme Court of the United States decided in 1797, in a case arising under the law of Rhode Island, that damages were properly assessed by the court in this State without the intervention of a jury, and overruled an exception to their assessment by the court on the ground that the law and the practice in Rhode Island expressly authorized the assessment of damages by the court, Mr. Justice Chase concurring, because, in his opinion, such was the provision of the common law. And see opinion of Mr. Justice Story in *Renner & Bussard* v. *Marshall,* 1 Wheat. 215 (1816).

In *Raymond* v. *Danbury & Norwalk R. R. Co.,* 14 Blatch. 133 (1877), it is said by the United States Circuit Court for the District of Connecticut, in an action for negligence, that "the assessment of damages upon a default either in actions of tort or of contract, stood upon a different footing from the trial of issues of fact." . . . "The conclusion is that the assessment of damages by a jury upon a default is matter of practice and not of right."

In *Hopkins et al.* v. *Ladd,* 35 Ill. 178 (1864), the court said of a case where damages were assessed by the court upon the defendant's demurrer being overruled: "This is a mere matter of practice none will deny, and being so, the assessment of damages could be

made by the court without a jury. The idea that a party has a
constitutional right to have a trial by jury is not controverted.
Here was no trial in any sense of that term. The defendant has
declined putting his case on trial by abiding the judgment on de-
murrer." In *Hanley* v. *Sutherland*, 74 Me. 212 (1882), the court
said: "The assessment of damages by a jury when done is a
matter of practice rather than of right."

In *Lennon* v. *Rawitzer et al.*, 57 Conn., 583 (1889), the full court
sustained the assessment of damages by the court on default in an
action to recover damages for personal injuries, although the
plaintiff desired a jury to assess the damages, saying: "This
practice has also in repeated instances received the express sanc-
tion of this court. The last time was in 1885, in *Seeley* v. *City of
Bridgeport*, 53 Conn. 1, and for other instances, see the cases there
cited on page 2."

In *Parker* v. *Roberts*, 63 N. H. 431 (1885), the court says: "A
default admits all the material allegations of the writ except the
amount of damages which are assessed by the court, unless for
special reasons an inquiry by the jury is ordered." And see cases
cited.

*Dean* v. *Willamette Bridge Co.*, 22 Ore. 167 (1892), was almost
identical with the case at bar. The action was for damages for
personal injuries alleged to have been sustained on a car of the
defendant company by reason of its negligence. The defendant
suffered a default and claimed that the court should assess the
damages under the law of Oregon of 1891, chapter 173, viz: "In
other actions including all actions sounding in damages or tort
. . . where judgment is rendered otherwise than on a verdict
in favor of the plaintiff, the court, without the intervention of the
jury, shall assess the damages which he shall recover," etc. But
upon demand of the plaintiff the court ordered the clerk to call a
jury to assess the damages, which was done, and verdict for the
plaintiff. The question thus presented to the Supreme Court by
the defendant was the question presented here. The provision of
the State constitution was almost identical with our own, and was
as follows: "In all civil actions the right of trial by jury shall
remain inviolate." And the full court said: "This provision of
the Constitution creates no new right to trial by jury. It simply
secures to suitors the right to trial by jury in all cases where that
right existed at the time the Constitution was adopted." . . .
"Prior to the adoption of the Constitution of this state, construed
in the light of our inquiries, the statute did not give to suitors the

right to have a jury assess damages in case of failure of the defendant to answer." And the court held the act constitutional and reversed the judgment upon the finding of the jury, saying, p. 172 : "The only purpose of the writ (of inquiry) in authorizing the jury to inquire into the damages, is to inform the mind or conscience of the court. This being its object, unless the court choose to issue the writ for its own information, it necessarily follows that it is discretionary with the court whether it will issue the writ, or when issued, whether it will award the amount of damages found by the jury or assess the damages itself without any inquest. This result proceeds upon the hypothesis that upon default the cause of action upon which issue might have been joined stands admitted, and that there is no issue of fact to try or nothing evolved by the pleadings upon which there can be a trial by jury." And on p. 176 : " Upon default, as we have shown, there is made by the pleadings of the parties no issue of fact to be tried by a jury. The cause of action is admitted, and there is no occasion for a trial by jury. The common law right of trial by jury, which it was the purpose of this constitutional provision to secure, relates only to those civil cases or causes of action in which there has been an issue made by the pleadings of the parties—where the facts alleged constituting the cause of action are denied and an issue of fact is formed which must be tried by a jury. Such a trial of an action has no application to an inquiry into damages, whether by the court or by a jury, after default, when the cause of action stands confessed."

Our own statute does not prohibit the court from calling to its aid a jury in such a case, as did the statute just referred to. But it does provide, nevertheless, that the damages, when assessed, shall be assessed by the act of the court. Doubtless, in most of the cases where the court might see fit to entrust this question to the consideration of a jury, the court would adopt the finding of the jury and would assess the damages accordingly. But the inherent power of the court to award more or less than the jury awarded is seen to have existed from remote antiquity, and is of necessity implied, recognized, and authorized in the language of the statute. Here the court refused at first to assess the damages ; and there is no record that the finding of the jury has been approved or disapproved by the court, or that the court has taken any action in the matter.

It follows that the defendant takes nothing by its exception to the discretionary action of the trial court in submitting the question of damages to the jury for their judgment thereon ; and inas-

much as the action of the court is necessary to determine the amount of damages to which the plaintiff is entitled, and the court has neither approved nor disapproved the finding of the jury, there has not yet been an assessment of the damages in the case, and consequently the question of the amount of damages is not properly before us, if, indeed, that question can be raised at all.

Case remitted to the Common Pleas Division for assessment of damages by the court in accordance with this opinion.

*Irving Champlin*, for plaintiff.

*Henry W. Hayes, Frank T. Easton, and Lefferts S. Hoffman*, for defendant.